FORD, ADM'X, v. THE CENTRAL IOWA R'Y CO.

1. **Railroads:** INJURY TO BRAKEMAN: NEGLIGENCE: VERDICT AGAINST EVIDENCE. Plaintiff's intestate, while preparing to couple cars on defendant's road, was caught by the foot between a guard-rail and one of the rails of the track, and, being unable to extricate himself, he made outcries, which were heard by a fellow brakeman on the train, who caused the train to be stopped, but not until plaintiff's intestate had been run over and injured, so that he died. The action was based on the theory that the men in charge of the train were negligent in not sooner hearing the outcries, or in not sooner stopping the train after hearing them. There was a judgment upon a verdict for plaintiff, but upon a consideration of the evidence, (see opinion,) *held* that there was nothing whatever to show negligence on the part of defendant's employes, and that the judgment must be reversed.

BECK and ROTHROCK, JJ., *dissenting.*

2. **New Trial:** VERDICT WITHOUT EVIDENCE: WHEN SET ASIDE: SPECIAL FINDINGS. When the conclusion reached by the jury in a general verdict appears to the court to be wrong, and it is shown by the special findings of the jury that they are unable to assign any certain or tangible ground for their conclusion, it is the duty of the court to interfere and grant a new trial. See opinion for illustration.

*Appeal from Wright Circuit Court.*

FRIDAY, OCTOBER 22.

THE plaintiff, Elizabeth Ford, brings this action as administratrix of the estate of her late husband, Thomas Ford, who was killed by being run over by one of the defendant's cars. The plaintiff avers that the intestate's death was caused by the negligence of the company, and without his negligence contributing thereto. There was a trial to a jury, and verdict and judgment were rendered for the plaintiff. The defendant appeals.

*H. E. J. Boardman, J. H. Blair* and *A. C. Daily,* for appellant.

*Ladd & Peterson, Nagle & Weber* and *Nourse & Kauffman,* for appellee.

ADAMS, J.—A large number of errors are assigned, but in the view which we have taken of the case it is not necessary, we think, to consider them all. All the persons who had any knowledge of the accident appear to have been fully examined, and we have to say that, taking the evidence in the most favorable light in which it can be viewed for the plaintiff, we think that it fails to show any negligence on the part of the company or any one of its employes. The decedent, Ford, was employed as a brakeman, and, while so engaged, his foot was caught between the main rail and a guard-rail, and he was unable to extricate himself. An engine, with several cars attached, was backing towards him. He made outcries, which were heard by the forward brakeman on the cars, who applied a brake and gave a signal to stop; and the cars were stopped, but not until Ford had been run over. The negligence of the company is alleged to consist of this: "That the forward brakeman and the engineer were inattentive to their duties, and failed to stop the train on hearing the outcry and signals of distress and danger of the deceased; or, if they failed to hear the outcries and signals of danger and distress, the said failure to hear was by reason of inattention to their duties." The evidence tends to show that the cars moved five or six car-lengths after Ford's outcries were first heard by by-standers, but the outcries were not heard by the engineer or fireman, or any one having control of the cars, except the forward brakeman, one Weeks, who was standing upon a box freight car, the third from the engine, looking towards Ford, and in the direction in which the cars were moving. At what precise time he heard them does not appear. If he heard them as soon as they were heard by others, and if the cars moved before they stopped as far as some of the evidence tended to show that they did, there would be some ground for an inference that either Weeks or the fireman or engineer failed to act with reasonable promptness.

*1. RAIL-ROADS: injury to brakeman: negligence: verdict against evidence.*

The plaintiff claims that there is some direct evidence of inattention on the part of those in control of the train, but the evidence relied upon as such appears to us to be of no significance whatever. On the other hand, the direct evidence shows that they were not inattentive. Weeks stood upon the box car, in sight of the fireman, for the purpose of giving signals to him. He did give signals to him, the last one of which was to stop. This signal was observed by the fireman, and communicated to the engineer, who was already standing with one hand on the throttle and the other on the reverse lever.

The direct evidence also shows that no time was lost after the outcries were first heard by Weeks. Weeks testified as follows: "Heard him [Ford] holler. I set a brake, and gave Mr. Butts [the fireman] signals for him to stop. As soon as I heard him holler I set the brake." The fireman testified as follows: "We got a signal to stop, and we stopped. * * * At the time I got the signal to stop I was looking out for signals, and was paying attention to nothing else. The engineer was paying attention to what was his business, and that was to move the engine and stop her. * * * Mr. Weeks put on the brakes. I saw him run for the brake. After Weeks gave the signal I don't think that the train ran more than a car-length. It was stopped as soon as we could stop it." The engineer testified as follows: "*Question*. I believe you said a train running at that rate of speed would run about a car-length when you undertook to stop. Is that right? *Answer*. Yes, sir. *Q*. Did this run more than that distance? *A*. I don't think it did. *Q*. It was stopped as soon as it could be? *A*. Yes, sir." There was no direct evidence to the contrary, and the question is as to whether there was any proven circumstance from which an inference might be drawn that should be regarded as tending to rebut the direct evidence. The plaintiff contends that there was, to-wit, the distance which the cars ran after the outcries were heard by others.

Where a sound is heard by one person, the inference would be that all other persons of good hearing, and *having equal opportunity to hear*, heard the sound also; and if they should testify that they did not, we think that it would be a question for the jury to determine whether the direct evidence was not rebutted by the circumstantial. But in the case at bar it was not shown that Weeks had as good an opportunity at first to hear the outcries as the by-standers had. As the cars approached Ford, Weeks, of course, was brought near to him. It is true that, even at first, Weeks was nearer to Ford than two of the by-standers. The latter must have been about 300 feet distant, and Weeks probably about 150 feet nearer; but in other respects Weeks' situation was less favorable for hearing the outcries. The two by-standers most remote were one Dirkson and one Eberhart. They were engaged in holding a team of horses which were frightened by the noise of the engine. They did not at first discover with certainty, from what they heard, that any one was in trouble. Dirkson testified: "At first there was some doubt between me and Eberhart as to whether there was anything the matter." He also testified that there was a high wind, and that he thinks it was such that it might have prevented those in control of the cars from hearing the outcries. The deceased also stated, immediately after the accident, that the wind was blowing; that he thought it was some short time before his cries were heard; and that he believed that the train was stopped as soon as practicable after they were heard. The other by-stander, one Farnsworth, was nearer than Dirkson and Eberhart, and saw Ford, and appears to have heard his outcries more distinctly. He was distant from Ford only about ten rods, but still a little further, probably, than Weeks was.

The unfavorableness of Weeks' situation for hearing the outcries was due to facts which remain to be stated. The moving portion of the train, it appears, consisted of six or seven cars, and Weeks stood on the third from the engine.

They were backing southward to be coupled to some cars standing on the track a few rods distant. Ford crossed the track south of the moving cars, from the west side to the east side, and then re-entered upon the track south of the moving cars, and between them and the standing cars. When he re-entered upon the track he passed out of sight of Weeks. It is not expressly shown what obstructed Weeks' view of Ford, but it is abundantly evident that it was that portion of the train which was between them. The evidence shows that there were three or four moving cars south of the car on which Weeks was standing. Whatever obstructed Weeks' view of Ford must, also, to some extent, have obstructed the sound of Ford's outcries. It is also shown that the engine was making some noise, and that noise, together with the noise of the moving cars, a part of which was between Weeks and Ford, must have tended to some extent to drown the sound of the outcries, and especially as there was a high wind at the time. Weeks' situation, then, was so different from that of the by-standers that the fact that they heard Ford's first outcries does not show that Weeks did, and does not tend to overcome Weeks' positive testimony that he set a brake and gave a signal to stop as soon as he heard the outcries. A circumstance entirely consistent with direct evidence does not raise an inference in rebuttal of it. And a verdict based upon such circumstance and in contravention of the direct evidence cannot be sustained.

One theory of the plaintiff's counsel is that Weeks stood and listened to Ford's outcries, knowing that he was in distress, until it was too late to prevent the cars from running over him. Such conduct would have been evidence of the deepest malice, and yet there is no evidence or pretense that Weeks entertained other than kind feelings towards his co-employe and fellow brakeman. It may be that Weeks should have given the signal to stop before he set the brake; but it is not shown in evidence that he should, nor is it so claimed in argument. A little time was necessarily consumed

in setting the brake before the signal was given. When given, it was given to the fireman who was watching for signals, and was by him given to the engineer. According to the evidence, the engineer, after receiving the signal, could not reverse his engine in less than two or three seconds, and, when reversed, it would run a car-length. The evidence shows that the train was loaded with coal, and that a train thus loaded cannot be suddenly stopped. The direct evidence of promptness on the part of those in control of the train was not only unrebutted by direct evidence, but, so far as we can see, by any proven circumstance. The signal might, it is true, have been different, and we think from the evidence that it should have been. It appears to have been a mere signal to stop, and did not indicate an emergency; but, according to the' undisputed' evidence, the train was stopped as soon as it could be, and if so the signal given answered the full purpose of one indicating an emergency. In our opinion the verdict is without support, and the judgment must be

REVERSED.

BECK, J., *dissenting.*—In my judgment the foregoing opinion of the majority of the court cannot be read with attention without producing a settled conviction in the mind of the reader that there was evidence tending to show negligence on the part of the intestate's co-employes which did authorize the jury, in the exercise of their discretion, without bias, passion or prejudice, to find for plaintiff upon the issue involving defendant's negligence. Indeed, I think it is both directly and inferentialy admitted' in the majority opinion that evidence of negligence of defendant was before the jury. It is directly admitted that there was some evidence tending to show that the cars moved, after the outcries of the intestate were heard by the by-standers, a distance indicating that they were not stopped with such promptness as proper care required, if the brakeman heard

the outcries as soon as the by-standers.  And it is also conceded that intestate's outcries were heard by the by-standers before any attempt to stop the cars was made.  Surely, whether the fact that others heard the cries was, under all the circumstances, evidence sufficient to authorize the conclusion that the cries were heard, or ought to have been heard, by those in charge of the train, were questions for the jury.  The fact that others heard the cries is a circumstance tending to prove that the brakeman did or could have heard them.  The weight of this circumstance should be determined by the jury, and not by this court.  The opinion of the majority contains other statements, which, to my mind, show conclusively that there was not such an absence of evidence upon the issue of defendant's negligence as authorizes this court to reverse the judgment.

The argument of the majority opinion upon the question of the insufficiency of the evidence to show defendant's negligence is astute, critical and of great ability.  It seems to me that when there is such absence of evidence as authorizes a court to set aside a verdict, we ought to see it without having our judicial vision strengthened by keen and critical argumentation.  The necessity for such an argument shows conclusively that there is evidence which the argument exhausts itself in attempting to deny.  That plain and clear absence of proof which requires us to reverse a judgment for want of evidence to support the verdict cannot exist, when it is necessary, in order to establish it, to resort to fine and acute argument.  The argument might, with propriety, be addressed to the jury, but ought not to be the lever used to overthrow its verdict.  In my opinion the judgment of the circuit court ought to be affirmed.

I am authorized to announce that MR. JUSTICE ROTHROCK concurs in this dissent.

OPINION ON REHEARING.

REED, J.—After the foregoing opinions were filed, a peti-

tion for a rehearing was filed by counsel for plaintiff. This petition was supported by an elaborate and very able oral argument, and, on that presentation of the case, I was led to doubt the correctness of the conclusion of the majority,—that the finding of the jury that the death of the intestate was caused by the negligence of the employes of defendant, who were in charge of the train, was without support in the evidence. I therefore favored the granting of a rehearing, that we might again look into the record, and re-examine the question. We have re-examined it, and have been led to the conclusion that the former holding of the majority on the question is correct. I have been greatly influenced in reaching this conclusion by matters shown by the record, but which are not referred to in the former opinion, and which were not specially called to our attention on the argument of the petition for rehearing.

The jury were required by the circuit court to answer certain special interrogatories. They found specially that the train-men in charge of the train did not do all that they could reasonably have done to stop the train as soon as they *actually* heard the outcry of the deceased, and discovered his peril. They were also required to answer the following interrogatories: " If you say either of the train-men were negligent in their duty, now state which,—give his name." They answered this question as follows: " Brakeman or fireman." They were also required to answer the following: " Also state what said negligence consisted of,—what duty did he omit;" which they answered as follows: " They omitted to give the engineer the proper signal."

2. NEW trial: verdict without evidence: when set aside: special findings.

The engineer testified that he received the signal to stop from the fireman; that he did not see the deceased at the time, and did not hear his outcry, or know that he was in peril; and that the signal communicated to him did not indicate that there was any emergency that required the sudden stopping of the train. He accordingly did not reverse the

engine, but permitted the train to move back, until it was stopped by the brakes. The special finding of the jury in answer to the first interrogatory quoted above, in effect, was, however, that he was not guilty of any negligence in failing to reverse the engine. The fireman was in the cab with the engineer. His position was on the left-hand or west side of the cab, and he was looking out for signals on that side. The foot of the deceased was caught between the guard-rail and the east side of the track. The fireman testified that he could not and did not see him, and, from the position of the parties and the train, it is apparent that this statement is true. He also testified positively that he did not hear the outcry, and there is no reason for disbelieving that statement. According to the testimony introduced by plaintiff, he must have been from 250 to 350 feet from Ford when the outcries were made. The wind was blowing a strong gale in the general direction from him to the deceased, and the train was between them. The engine was also working at the time, and the noise made by it would naturally tend to prevent him from hearing the cries. He also testified that when he received the signal to stop the train, which was given by the brakeman on top of the train, he immediately communicated it to the engineer, and his testimony in this respect is entirely uncontradicted. As stated in the original opinion of the majority, the brakeman testified that, when he heard the outcry of the deceased, he immediately set the brakes, and gave the signal to stop the train.

It must be borne in mind that the general verdict was found on the theory that the train-men did not do all that reasonably could have been done to stop the train after they *actually* heard the outcries of deceased, and discovered his peril, and not upon the theory that they were negligent in not sooner hearing the cries or discovering his peril. This is shown beyond question by the special findings. If, then, the brakeman was negligent after he actually heard the outcries, and discovered the peril, his negligence consisted in the

fact either that he waited until he had set the brakes before giving the signal to stop, or that he omitted to indicate by his signal that there was a necessity for stopping the train immediately; and, if the fireman was negligent, his negligence must have consisted in the fact that, while the signal communicated to him by the brakeman indicated that some emergency existed which required that the train should be stopped at once, he did not communicate that fact to the engineer. It has not been claimed in argument that the general verdict can be sustained upon any other ground than that one of these theories is true.

The jury were required, in effect, by the interrogatories, to determine which of these was supported by the evidence. They were required to determine whether the fireman or the brakeman was negligent, and, if so, in what his negligence consisted. But it cannot be said that they have determined that question. Their finding was not that either or both of them had been negligent, but that one or the other had acted negligently. It does not determine that the brakeman was negligent in not giving a signal that would indicate the existence of some emergency which required that the train be stopped at once, or in setting the brakes before giving the signal to stop. Neither does it determine that the fireman was negligent in omitting to communicate the proper signal to the engineer. Whether a particular act or omission amounts to negligence depends upon the circumstances under which it occurred. The answer to the question whether a party has acted negligently is in the nature of a deduction or conclusion drawn from the circumstances proven, and it is generally the province of the jury to draw that conclusion; and, if the conclusion reached by the jury can be reasonably drawn from the circumstances, the court ought not to interfere with it, even though the opposite conclusion appears to it to be the more reasonable. But when the general conclusion reached appears to the court to be wrong, and it is shown by the special findings of the jury that they are unable to assign

any certain or tangible ground for their conclusion, it is clearly the duty of the court to interfere; and that appears to me to be the present condition of the case. The evidence relied on to prove that either the fireman or brakeman acted negligently in the transaction is, to my mind, meager and unsatisfactory. Still, if the jury had, in obedience to the direction of the court, determined that one of them was guilty of negligence, and had pointed out specifically in what his negligence consisted, I might have hesitated long before consenting to disturb their verdict. Their finding, however, satisfies me that they were unable to find from the evidence that either of the parties had acted negligently. The general verdict, therefore, appears to me to be without support, and should be set aside.

The former opinion will be adhered to.

BECK, J., adheres to his dissenting opinion heretofore filed.

ROTHROCK, J., took no part in the final determination of the petition for rehearing.